**MARRIOTT EMPLOYEES' FEDERAL CREDIT UNION, Plaintiff/Appellant,**

v.

**Albert S. HARRIS, Defendant/Appellee.**

Court of Appeals of Tennessee, Western Section, at Nashville.

Dec. 14, 1994.

Application for Permission to Appeal Denied by Supreme Court April 3, 1995.

Glenn B. Rose, C. Mark Pickrell, Harwell, Howard, Hyne, Gabbert & Manner, P.C., Nashville, for plaintiff/appellant.

John R. Phillips, Jr., Phillips & Ingrum, Gallatin, for defendant/appellee.

FARMER, Judge.

This appeal arises from a suit by Marriott Federal Employees' Credit Union ("Credit Union") against Albert S. Harris ("Harris") to collect a deficiency remaining on a $285,-950 loan secured by 9,500 shares of Marriott Corporation common stock. Harris denied any personal liability for funds he received from the Credit Union and counterclaimed that the Credit Union was liable for failing to notify him of the decline in value of the Marriott stock. The Chancery Court for Trousdale County granted partial summary judgment in favor of the Credit Union on the issue of Harris' personal liability for the debt. After a trial on Harris' counterclaim, the chancellor ruled that the Credit Union, acting as an "investment advisor," had a duty to notify Harris of the decline in value of the

Marriott stock during the term of the loan, and was thus liable, in the amount of the deficiency otherwise due, for failing to give him such notice.

The Credit Union appeals the judgment in favor of Harris on his counterclaim for the full amount of the deficiency. Harris challenges the chancellor's grant of partial summary judgment in favor of the Credit Union.

A review of the procedural history of this case is in order. On October 23, 1992, the Credit Union initiated the present action as a claim against Harris and his wife, Marie, alleging that they had engaged in a fraudulent conveyance related to the purchase of their Trousdale County home with funds borrowed from the Credit Union.[1] In their answer, the Harrises denied liability and Harris counterclaimed that the Credit Union was liable for breach of a fiduciary duty to monitor the value of the stock which the Credit Union alleged secured the loan. The chancellor granted the Harrises summary judgment on the fraudulent conveyance claim on March 29, 1993.

Following this summary judgment, the case proceeded on Harris' counterclaim that the Credit Union owed him a duty to monitor the market price of the stock. However, by agreed order, the Credit Union was permitted to amend its complaint to include the breach of contract claim for the deficiency which is the subject of this appeal.[2] The Credit Union alleged that Harris had contracted to borrow $285,950 to be repaid in one year at an interest of 11% per annum and secured by 9,500 shares of Marriott Corporation common stock and that Harris breached that contract by failing to repay the borrowed amount. In his answer to the amended complaint, Harris continued to deny personal liability for the money admittedly received from the Credit Union.

On January 14, 1993, the Credit Union filed a motion for summary judgment on its breach of contract claim and on Harris' counterclaim. Following a hearing, the chancel-

---

**1.** The record reveals that on November 30, 1990, the Credit Union had filed a complaint against Harris, claiming that he owed $285,950 on a stock-secured loan. The Credit Union later voluntarily dismissed this complaint.

**2.** Marie Harris was not named as a defendant in the claim for the loan deficiency.

lor denied the motion by order entered on February 17, 1994. However, on the morning of trial, the chancellor informed the parties that he had decided to grant summary judgment on the Credit Union's claim against Harris. The chancellor stated,

I'll let the record reflect that I've reconsidered my motion for summary judgment and that I've granted summary judgment in regard to the fact that I found that [Harris] did make a loan from the [Credit Union] in the amount of [$285,950]. . . .

. . . .

And the issue before the court today is whether or not there should be a set-off against the judgment for failure of the [Credit Union] to notify [Harris] of the fact that the stock were going down in value, I suppose whether or not the plaintiffs were acting as investment advisers, and whether . . . the [Credit Union] acted properly under [T.C.A. §] 47-9-207. I believe that's the issue. . . .

In his final order, the chancellor clarified the scope of the summary judgment,

IT IS ORDERED, ADJUDGED AND DECREED that the Motion for Summary Judgment of Plaintiff/Counter-Defendant, Marriott Employee's Federal Credit Union, is reconsidered and is hereby granted in part to the extent that it is the finding and judgment of the Court that the Defendant, Albert S. Harris, did have a loan for which he is *personally obligated* to the Plaintiff, Marriott Employee's Federal Credit Union. . . . (Emphasis added.)

■ We first review the chancellor's grant of partial summary judgment. In evaluating a summary judgment motion, the principal issues we must consider are: "(1) whether a *factual* dispute exists; (2) whether the disputed fact is *material* to the outcome of the case; and (3) whether the disputed fact creates a *genuine* issue for trial." *Byrd v. Hall,* 847 S.W.2d 208, 214 (Tenn.1993). If

we find that there is no dispute regarding the material facts, we must then determine whether the moving party is entitled to a judgment as a matter of law. *See id.* at 214–15. Summary judgment is appropriate on claims capable of resolution on legal issues alone. *Bellamy v. Federal Express Corp.,* 749 S.W.2d 31, 33 (Tenn.1988).

■ In reviewing this summary judgment, we consider only those facts that were before the chancellor prior to hearing evidence at the trial on Harris' counterclaim.[3] Our review of the record reveals that the following facts relevant to the Credit Union's breach of contract claim were undisputed.[4]

Harris worked for the Marriott Corporation for approximately ten years before retiring in 1990. During his tenure with Marriott, Harris became entitled to options to purchase 9,500 shares of Marriott Corporation common stock. In the Fall of 1989, Harris contacted the Credit Union to apply for a loan to finance the exercise of his stock options. Harris asked to borrow $108,456, the amount necessary to purchase his stock options. On October 11, 1989, Harris signed two promissory notes indicating that he agreed to be personally liable for the $108,456 borrowed from the Credit Union at 11% per annum interest, with payment due on November 5, 1989, and using the 9,500 shares of Marriott stock as collateral.

On October 4, 1989, Harris signed documents titled, "Share Secured/Stock Secured Loan Application," "Stock Option Loan Transaction Instructions," and "Irrevocable Stock or Bond Power." The Stock Option Loan Transaction Instructions allowed Harris to direct the Credit Union to take one of three courses of action with the Marriott stock used to secure the $108,456 note: 1) sell the stock prior to receipt of the stock certificates and use the proceeds to pay the loan; or 2) sell the stock after the certificates

---

3. Pursuant to Rule 54.02, the chancellor could have reversed himself on the summary judgment decision up to the date of entry of the final judgment which in this case was after hearing evidence related to Harris' counterclaim at trial. However, the record does not indicate that the chancellor reconsidered the summary judgment in light of the evidence adduced at trial.

4. In reviewing these facts, we must take the strongest legitimate view of the evidence in favor of the non-moving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Byrd,* at 210–11 (Tenn. 1993).

were delivered to the Credit Union and use the proceeds to pay the loan; or 3) refinance the loan using the stock as collateral. Harris chose the third alternative, thereby asking the Credit Union to refinance the original stock secured loan. The form indicates that under the new terms the principal would have then been due in one year with the borrower making monthly interest payments. The "Share Secured/Stock Secured Loan Application" contained a notation that the refinanced loan was to be at 11% for 12 months.

On October 5, 1989, the Credit Union paid the Marriott Corporation $108,456 to purchase Harris' 9,500 shares of Marriott stock. The Marriott Corporation then sent the Credit Union the certificates representing the 9,500 shares. At Harris' request, the Credit Union deposited $177,494 in Harris' Maryland bank account on October 16, 1989. Harris later admitted that he borrowed a total of $285,950 from the Credit Union. The Credit Union, however, failed to obtain Harris' signature on a promissory note reflecting the total amount borrowed. Instead, Harris maintained that Marcia Hulihan, a representative of the Credit Union, told him that "the stock was all they needed to do the deal and that the money was mine with no strings attached. . . ."

After sending the $177,494 to Harris' Maryland bank, the remaining amount of the loan, $108,456, was applied toward the two notes executed by Harris on October 11, 1989. Harris acknowledged that he used a substantial portion of the $177,494 from his Maryland bank account to purchase his house in Trousdale County on October 26, 1989.

From October 1989 to October 1990, interest payments on the loan were automatically paid by payroll deduction from Harris' Marriott Corporation salary. Harris did not make any payment on the principal of the $285,950 loan alleged by the Credit Union to be due in October 1990. Between October 1989 and October 1990, the price of Marriott stock sharply declined such that the value of the stock was substantially less than the amount due to the Credit Union in October of 1990. In March of 1991, under the authority granted by the Irrevocable Stock Power,

the Credit Union sold the 9,500 shares and applied the $188,472.98 in proceeds to the principal balance which at that time left a remaining balance of approximately $102,000.

■ Harris argues that he cannot be held personally liable for $285,950 received from the Credit Union because he did not sign a promissory note agreeing to such liability. He further contends that there was no meeting of the minds between himself and the Credit Union regarding the nature of the transactions previously described and therefore no contract was formed between the parties. The Credit Union argues that the various documents which Harris signed demonstrate that he agreed to borrow the money from the Credit Union and to repay it within the year.

After reviewing the Credit Union's motion for summary judgment, Harris' response thereto, the documents and depositions filed with the chancery court, and Harris' opposing affidavit, we find that the only reasonable conclusion that can be drawn from the undisputed material facts is that Harris borrowed the $285,950, pledged the 9,500 shares as a security interest, and failed to repay the loan when it came due. Because the documents signed by Harris, taken as a whole, reveal that he agreed to borrow a total of $285,950 from the Credit Union using the Marriott stock as collateral, we find no merit in Harris' contention that he is not personally liable for the deficiency remaining on the loan because there was no signed promissory note. According to T.C.A. § 47-9-504(1), upon default by a debtor, a secured party has the right to sell in a commercially reasonable manner the collateral securing an indebtedness and to apply the proceeds to the indebtedness. Absent an agreement to the contrary, the debtor remains liable to the secured party for any deficiency. T.C.A. § 47-9-504(2). As there was no agreement to the contrary, we find that the chancellor did not err in granting summary judgment in favor of the Credit Union on its claim for the loan deficiency.

■ We next review the chancellor's judgment in favor of Harris on his counterclaim that the Credit Union was liable for failing to

notify him of the decline in value of the Marriott stock. The chancellor's final order states,

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that ... Albert S. Harris, is due offset to the debt or obligation found owed by him to [the Credit Union], by reason of such entity's breach of fiduciary duty, which the Court finds it undertook pursuant to the facts and circumstances of this case with respect to the 9,500 shares of Marriott stock which [the Credit Union] took possession of under Irrevocable Stock and Bond Power, and that offset for such breach of fiduciary duty is properly the full deficiency balance otherwise due of Harris to [the Credit Union].…

The Credit Union raises three issues on appeal of this judgment:

I. As a matter of law, does a credit union that makes a loan secured by stock have a duty to notify the borrower of any decline in the value of the pledged stock?

II. Under the facts of this case, did the borrower Harris prove that the lender Marriott Employees' Federal Credit Union had a duty to notify him of the decline in value of his pledged stock?

III. Given that Harris was aware of the decline in value of his pledged stock, did the trial court err by awarding him damages as a result of the Credit Union's failure to notify him of that declining value?

■ The question of whether the Credit Union had a duty to monitor the market value of the stock pledged as collateral presents a question of law. As such, our review of the judgment below is *de novo* upon the record without a presumption of correctness. T.R.A.P. 13(d); *see also Walker v. Nationwide Insur. Co.,* 813 S.W.2d 135 (Tenn.App. 1990).

As stated previously, it was undisputed that the pledged stock declined in value from October 1989 to October 1990. In October of 1989 Marriott stock had a market value of over $37 per share; in October of 1990, when the loan became due and payable, the stock price had dropped to around $9 per share.

Harris argues that the Credit Union owed him a fiduciary duty to monitor the value of the stock while it held possession of the stock certificates as collateral, and that it breached that duty by not notifying him of the decline in value that occurred between October 1989 and October 1990.

Tennessee's Uniform Commercial Code ("U.C.C." or "Code") establishes a secured party's duty with respect to preservation of pledged collateral. The Code mandates that the secured party "use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed." T.C.A. § 47–9–207(1)(1992). The common law duty of reasonable care stated in *Restatement of Security* §§ 17–18 is incorporated into the U.C.C. through official comment (1) to T.C.A. § 47–9–207. The language of § 17 is similar to the first sentence of U.C.C. § 9–207(1) creating the duty to use reasonable care. Comment (a) § 17 clarifies the nature of the duty, "[t]he rule of reasonable care expressed in this Section is confined to the physical care of the chattel, whether an object such as a horse or a piece of jewelry, or a negotiable instrument or document of title." The language of § 18, which parallels the second sentence of U.C.C. § 9–207(1), does not deal with the diminution in value of the pledged stock. Comment (a) to § 18 makes this clear: "The pledgee is not liable for a decline in value of pledged instruments, even if timely action could have prevented such decline."

■ We agree with the reasoning provided by the Seventh Circuit Court of Appeals in *Capos v. Mid–America National Bank,* 581 F.2d 676, 680 (7th Cir.1978),

It is the borrower who makes the investment decision to purchase stock. A lender in these situations merely accepts the stock as collateral, and does not thereby itself invest in the issuing firm. Nor, unless otherwise agreed, does the lender undertake to act as an investment adviser, although imposing a duty on the lender to sell the stock at the "reasonable" time would foist that role upon it.

We therefore hold that the duty of reasonable care when applied to stock pledged as collateral refers to the physical possession of the stock certificates and neither imposes liability upon a lender if the market value of the stock declines nor establishes a duty to notify the pledgor of the decline in value. *Id.* at 680–81 (7th Cir.1978); *see also FDIC v. Webb,* 464 F.Supp. 520, 526 (E.D.Tenn.1978).

In his brief, Harris relies on the *Webb* decision for the proposition that the Credit Union nevertheless owed him a duty to monitor the value of the pledged stock and to notify him of its decline in value because of the Credit Union's close relationship with the Marriott Corporation. After stating that a pledgee does not have a duty to sell pledged stocks which have declined in value, the *Webb* court added that it "considers it possible for a pledgee, by his actions, to assume a duty to notify the pledgor of declining stock value so as to permit the pledgor of stock to seek sale, providing substitute collateral if necessary to secure any remaining indebtedness." *Webb,* 464 F.Supp. at 527. The court however was not presented with the issue of whether such a duty existed because the borrower had signed a note which obligated him to oversee the preservation of his collateral. *Id.* In our opinion the statement, which suggests that a pledgee may in some circumstances assume a duty to notify, made in dicta of *Webb* does not properly express a pledgee's duty under Tennessee law with respect to stock pledged as collateral.

The second and third issues presented by the Credit Union are pretermitted by our decision with regard to the first issue presented. The summary judgment granted by the trial court in favor of the Credit Union is affirmed. The court's judgment in favor of Harris on his counterclaim is reversed. Costs are assessed to Harris, for which execution may issue if necessary.

TOMLIN, P.J., W.S., and CRAWFORD, J., concur.