IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 7, 2004 Session

## FIRST TENNESSEE BANK NATIONAL ASSOCIATION
## v. BAD TOYS, INC., ET AL.

**Appeal from the Law Court for Sullivan County**
**No. C35289     John S. McLellan, III, Judge**

---

**No. E2003-02503-COA-R3-CV - FILED SEPTEMBER 14, 2004**

---

First Tennessee Bank National Association ("the Bank") sued Bad Toys, Inc. and Larry N. Lunan on a note that allegedly was "fully mature, owing and unpaid." The note had been cross-collateralized with two other notes payable to the Bank. The three notes and the attendant guaranty agreements and security agreements were executed either by Bad Toys, Inc., Larry N. Lunan, or Susan H. Lunan ("Defendants" or as appropriate "the Lunans"). In addition to other collateral, shares of stock were pledged as collateral for the notes. Bad Toys, Inc. and Larry N. Lunan answered the complaint and filed a counter-complaint in which Susan H. Lunan joined as a counter-plaintiff. The counter-complaint alleged, in part, that the Bank had breached its fiduciary duty to the Lunans by failing to sell the pledged stock and that the Bank either had been grossly negligent or had intentionally caused harm to Defendants by refusing to sell the stock. The Bank filed a motion to dismiss and for summary judgment. Defendants opposed by filing the Lunans' affidavit claiming that the Bank had agreed to sell the shares of stock as soon as they were pledged, even though the Lunans were forbidden by an agreement with other shareholders from selling the stock themselves, and that the Bank failed to sell the shares of stock as it had agreed to do. The Trial Court held the Lunans' affidavit should be stricken, in part, and granted the Bank summary judgment. Defendants appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Law Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

R. Wayne Culbertson, Kingsport, Tennessee and Terry Risner, Mount Carmel, Tennessee, for the Appellants, Bad Toys, Inc., Larry N. Lunan, and Susan H. Lunan.

Robert L. Arrington, Kingsport, Tennessee, for the Appellee, First Tennessee Bank National Association.

# OPINION

## Background

On September 1, 2000, Susan Lunan executed a note ("Note 1") in the amount of $48,000 payable to the Bank. Note 1 was secured by a security interest in a 2000 Mercedes-Benz automobile and by a pledge of shares of stock. Larry Lunan guaranteed payment of Note 1 by executing a separate guaranty. On December 29, 2001, Bad Toys, Inc. executed a note ("Note 2") payable to the Bank in the amount of $50,000. The Lunans guaranteed payment of Note 2 with a separate guaranty agreement. Note 2 is secured by a security interest in a 1999 Phoenix Custom motorcycle and five additional motorcycle frames, and by a pledge of the same shares of stock securing Note 1. On June 18, 2001, the Lunans executed a note ("Note 3") in the amount of $20,000 payable to the Bank. Note 3 was secured by a security interest in a 1987 Mercedes-Benz automobile and a 1974 Harley-Davidson motorcycle. Notes 1, 2, and 3, were cross-collateralized. In May of 2003, the Bank sued Bad Toys, Inc. and Larry Lunan on Note 2.

Note 2 provides, in pertinent part:

> Any money or other property at any time in the possession of the Bank belonging to the undersigned or any other parties liable hereon, and any deposits or other sums at any time credited by or due from the Bank to the undersigned or any other parties liable hereon, may at all times, at the option of the Bank, be held and treated as collateral security for the payment of this Note or any other liability of any of the undersigned, or any other party liable hereon to the Bank, whether due or not due. The Bank may, at any time, at its option, and without notice, setoff the amount due or to become due hereon against the claim of any of said parties against the Bank.

The Guaranty Agreement signed by the Lunans in connection with Note 2 provides, in pertinent part:

> The Bank shall have the exclusive right to determine how, when and what application of payments and credits, if any, shall be made on said indebtedness, or any part thereof, and shall be under no obligation, at any time, to first resort to, make demand on, file a claim against, or exhaust its remedies against [the Lunans], any one or more of the undersigned, or other persons or corporations, their properties or estates, or to resort to or exhaust its remedies against any collateral, security, property, liens or other rights whatsoever.

> \* \* \*

> In the event of the death, incompetency, dissolution, liquidation, insolvency (however evidenced) of, or institution of bankruptcy or receivership proceedings by or against

[the Lunans], all of the indebtedness of [the Lunans] then existing shall, for the purposes of this guaranty, and at the option of the Bank, immediately become due and payable from [the Lunans]; . . .

* * *

No act of commission or omission of any kind, or at any time, on the part of the Bank in respect of any matter whatsoever shall in any way affect or impair this guaranty.

* * *

This guaranty contains the entire agreement between the parties and every part thereof shall be binding upon [the Lunans], jointly and severally, and upon their respective heirs, legal representatives, successors and assigns, as fully as though everywhere specifically mentioned, and shall be construed according to the laws of the State of Tennessee, in which State it shall be performed by [the Lunans].

The Security Agreement executed by Susan Lunan in connection with Note 2 provides, in pertinent part:

Upon the maturity of any note or other obligation (whether maturity be according to the face of said note or other obligation or by virtue of the exercise of the option hereinabove given the Bank), the Bank may, without notice or demand, forthwith apply any balances of any deposits of the undersigned with the Bank toward the payment of any and all of the liabilities of the undersigned to the Bank and may likewise forthwith realize upon any property of the undersigned in the Bank's possession and receive the proceeds therefrom, and may also, in accordance with the applicable provisions of the Tennessee Uniform Commercial Code, sell at public or private sale, or at any exchange or broker's board, at such prices as it may deem best, either for cash or on credit or for future delivery, any part or all securities or property of any kind held by it as collateral security or in which it may have a lien or security interest. . . .

The Commercial Security Agreement executed by the Lunans in connection with Note 3, which is cross-collateralized with Notes 1 and 2, provides, in pertinent part:

If [the Bank] at any time has possession of any Collateral, whether before or after an Event of Default, [the Bank] shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if [the Bank] takes such action for that purpose as [the Lunans] shall request or as [the Bank], in [the Bank's] sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by [the Lunans] shall not of itself be deemed to be a failure to exercise reasonable care. [The Bank] shall not be required to take any steps necessary to

preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the indebtedness.

* * *

If an Event of Default occurs under this Agreement, at any time thereafter, [the Bank] shall have all the rights of a secured party under the Tennessee Uniform Commercial Code. In addition and without limitation, [the Bank] may exercise any one or more of the following rights and remedies:

* * *

> Sell the Collateral. [The Bank] shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in [the Bank's] own name or that of [the Lunans]. [The Bank] may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, [the Bank] will give [the Lunans] reasonable notice of the time after which any private sale or any other intended disposition of the Collateral is to be made. . . .

* * *

This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

The shares of stock pledged as collateral for the notes initially were shares of a corporation named Bad Toys, Inc. In 2000, the Lunans entered into a reverse merger transaction in which Bad Toys, Inc. divested itself of assets and merged with a company named MyCom Group, Inc. Bad Toys, Inc. was the surviving corporation of the reverse merger, but it immediately changed its name to MyCom Group, Inc. Thus, the shares pledged as collateral for the notes were MyCom Group, Inc. shares. The assets of the original Bad Toys, Inc. corporation were then transferred to BTMC, Inc., another corporation owned by the Lunans. BTMC, Inc. then changed its name to Bad Toys, Inc. This new Bad Toys, Inc. is the corporation named as a Defendant in this case.

In connection with the reverse merger transaction discussed above, the Lunans entered into an agreement ("Dribble Agreement") with the other MyCom Group, Inc. shareholders, which provided that the shareholders could sell their shares in MyCom Group, Inc. only in certain stated increments over a specified period of time. The Dribble Agreement, however, did not prevent

-4-

the shareholders from pledging their stock as collateral for loans. A pledgee on a loan would not be prevented from foreclosing on the collateral if the loan was in default.

Although the Lunans and Bad Toys, Inc. were from time to time in arrears in making some of the loan payments, the loans were not declared in default until after December 10, 2002, when Susan Lunan filed a bankruptcy petition under Chapter 11 of the United States Bankruptcy Code. In May of 2003, the Bank filed this suit against Bad Toys, Inc. and Larry Lunan for the indebtedness on Note 2 claiming, in part, that the debt was "fully mature, owing and unpaid." Bad Toys, Inc. and Larry Lunan answered the complaint and filed a counter-complaint in which Susan Lunan joined. The counter-complaint alleged, in part, that the Bank had breached its fiduciary duty to the Lunans by failing to sell the stock pledged as collateral and that the Bank either had been grossly negligent or had intentionally caused Defendants harm by refusing to sell the stock.

During the period between when the shares of stock were pledged as security for the notes and the time when the limitation on the sale of the stock under the Dribble Agreement expired, the value of the stock declined. Defendants assert that the shares of stock were trading for $2.25 per share when they were pledged. However, a Supplement to Financial Statements that the Lunans provided to the Bank in August of 2000, shows that although the Lunans expected the share value to exceed $2.00 per share by the time the Dribble Agreement expired, the price was only 53 cents per share at that time. By the time the Dribble Agreement limitation on the sale of the shares of stock expired, the stock was trading for no more than four cents per share.

The Bank filed a motion to dismiss and for summary judgment. In opposition, the Lunans filed an affidavit supporting their claim that the Bank represented it would sell the stock if it was pledged as security for the loans. The affidavit states, in part, that the Bank told the Lunans that it had the Dribble Agreement analyzed and had determined it would have the right to sell the shares of stock if, and as soon as, they were placed as collateral. The affidavit also asserts that the Bank represented it immediately would sell the shares of stock "to satisfy the obligations of the Lunans and provide additional funds that would be for the benefit of the Lunans." Further, the affidavit states the Lunans made several requests to the Bank to sell the stock and the Bank never "advised either of the Lunans that they had reversed their decision to sell the stock certificates." The Lunans do admit, however, that there is no document showing that the Bank had the right to sell the shares of stock except in accordance with the security agreements executed in connection with the notes.

The Trial Court entered an Order and Writ of Possession on September 17, 2003, finding and holding, *inter alia*, that there was no genuine issue of material fact, that the Bank was entitled to judgment as a matter of law on the undisputed facts, and that the affidavit submitted by the Lunans "seeks to inject proof of statements made prior to the execution of the Note, Security Agreement and other loan documents at issue in this case, . . . " and fails to set forth facts admissible in evidence and, therefore, to that extent should be stricken. The order also dismissed the counter-complaint and awarded the Bank immediate possession of the 1974 Harley-Davidson motorcycle and the motorcycle frames pledged as collateral for the loans and held Defendants liable for any

deficiency on the note after the Bank's disposal of the collateral. Defendants appeal to this Court.

**Discussion**

Although not stated exactly as such, Defendants raise two issues on appeal: 1) whether the Trial Court erred in striking the Defendants' affidavit "to the extent it seeks to inject proof of statements made prior to the execution of the Note, Security Agreement and other loan documents at issue in this case . . ."; and, 2) whether the Trial Court erred in granting the Bank's motion to dismiss and for summary judgment.

In *Blair v. West Town Mall*, our Supreme Court recently reiterated the standards applicable when appellate courts are reviewing a motion for summary judgment. *Blair v. West Town Mall,* 130 S.W.3d 761 (Tenn. 2004). In *Blair*, the Court stated:

> The standards governing an appellate court's review of a motion for summary judgment are well settled. Since our inquiry involves purely a question of law, no presumption of correctness attaches to the lower court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tennessee Rule of Civil Procedure 56 have been met. *See Staples v. CBL & Assoc., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *Hunter v. Brown,* 955 S.W.2d 49, 50-51 (Tenn. 1997); *Cowden v. Sovran Bank/Central South,* 816 S.W.2d 741, 744 (Tenn. 1991). Tennessee Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: 1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and 2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. *Staples*, 15 S.W.3d at 88.
>
> * * *
>
> When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact.
>
> To properly support its motion, the moving party must either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense. If the moving party fails to negate a claimed basis for the suit, the non-moving party's burden to produce evidence establishing the existence of a genuine issue for trial is not triggered and the motion for summary judgment must fail. If the moving party successfully negates a claimed basis for the action, the non-moving party may not simply

rest upon the pleadings, but must offer proof to establish the existence
of the essential elements of the claim.

*Blair,* 130 S.W.3d at 763-64, 767 (quoting *Staples*, 15 S.W. 3d at 88-89) (citations omitted)).

Our Supreme Court has also provided instruction regarding assessing the evidence when dealing with a motion for summary judgment stating:

The standards governing the assessment of evidence in the summary judgment context are also well established. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. *See Robinson v. Omer,* 952 S.W.2d at 426; *Byrd v. Hall,* 847 S.W.2d at 210-11. Courts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion. *See McCall v. Wilder,* 913 S.W.2d 150, 153 (Tenn. 1995); *Carvell v. Bottoms,* 900 S.W.2d 23, 26 (Tenn. 1995).

*Staples v. CBL & Assocs., Inc.,* 15 S.W.3d 83, 89 (Tenn. 2000).

We first will consider whether the Trial Court erred in striking, in part, the Lunans' affidavit. Defendants argue they gave permission for the Bank to sell the shares of stock and the Bank agreed to do so immediately, even though the Lunans were forbidden from selling the stock themselves. The Lunans' affidavit claims, in part, that the Bank represented it had the Dribble Agreement analyzed and determined that if the shares of stock were pledged as collateral, the Bank could sell them; that the Bank would sell the stock if the Lunans executed a pledge agreement; and that the Lunans delivered the stock certificates to the Bank based upon the Bank's representation that it would sell the stock once it was pledged so as to satisfy the Lunans' obligations and provide additional funds to go to the Lunans' benefit. The affidavit further states the Lunans made several requests to the Bank to sell the stock, but the Bank never did so and never advised the Lunans "that they had reversed their decision to sell the stock certificates." In short, the Lunans claimed in their affidavit that the Bank agreed, prior to the execution of the relevant loan documents, that it would immediately sell the stock if it was pledged so as to enable the Lunans to avoid the restrictions placed on them by the Dribble Agreement, and that the Bank later refused to do what it had orally promised to do prior to the execution of the loan documents.

The Trial Court held Defendants' affidavit should be stricken "to the extent it seeks to inject proof of statements made prior to the execution of the Note, Security Agreement and other loan documents at issue in this case . . ." because it fails to "set forth facts that are admissible in evidence, as required by Tenn. R. Civ. P. 56.06 . . . ." The Trial Court struck these portions of the Lunans' affidavit as a violation of the parol evidence rule and, therefore, those "facts" are not admissible in evidence.

As this Court discussed in *GRW Enters., Inc. v. Davis*:

The parol evidence rule is a rule of substantive law intended to protect the integrity of written contracts. Since courts should not look beyond a written contract when its terms are clear, the parol evidence rule provides that contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract.

The rule appears to be quite all-encompassing. However, the courts have been reluctant to apply it mechanically and have now recognized that it has numerous exceptions and limitations. Thus, the rule does not prevent using extraneous evidence to prove the existence of an agreement made after an earlier written agreement, or to prove the existence of an independent or collateral agreement not in conflict with a written contract. In each of these circumstances, the courts have conceived that the parol evidence is not being used to vary the written contract but rather to prove the existence of another, separate contract.

*GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990) (citations omitted).

We first must look to the documents that constitute the original written contract between the parties to determine if the terms are clear and unambiguous. A careful review of the note, guaranty agreement, and security agreements provided in the record on appeal shows that the documents are clear and unambiguous. The documents provide that the Bank had the right to sell the collateral pledged only upon default. In addition, the documents provide that while the Bank had the option of selling the collateral upon a default, it was not required to do so. Nothing in the documents either gives the Bank the right to sell the collateral prior to a default or requires it do so at anytime. Defendants' position is that the Bank agreed to do something that, at best, was questionable, i.e., immediately sell the shares of stock for the Lunans' benefit even though the Lunans were prohibited from doing so themselves.

As the written contract between the parties is clear and unambiguous, we next review the loan documents to determine if the affidavit is an attempt to prove an independent or collateral agreement not in conflict with the written contract, as argued by the Defendants. In this case, the loan documents clearly state they constitute the entire agreement between the parties. In addition, the Lunans' affidavit attempts to contradict the clear terms of the written agreement by stating the Bank represented it would sell the stock prior to a default and that the Bank was obligated under this oral agreement to sell the stock as soon as it was pledged to satisfy the Lunans' obligations and provide the remaining funds to the Lunans' benefit. Clearly, the Lunans' affidavit is extraneous evidence introduced in an attempt to alter or vary a loan agreement so as to change the plain meaning of the unambiguous written loan contract. Thus, the affidavit filed by Defendants violates the parol evidence rule. We hold that the Trial Court was correct in striking, in part, the Lunans' affidavit.

We next consider whether the Trial Court erred in granting the Bank's motion to dismiss and for summary judgment. It is clear from the Trial Court's order that it considered documents outside the pleadings and, therefore, what the Trial Court granted was summary

judgment. Having upheld the Trial Court's decision to strike, in part, the Lunans' affidavit, we affirm the Trial Court's decision that there was no genuine issue of material fact and that the Bank was entitled to summary judgment as granted by the Trial Court on both the counter-complaint and the Bank's original complaint.

In Tennessee, "the duty of reasonable care when applied to stock pledged as collateral refers to the physical possession of the stock certificates and neither imposes liability upon a lender if the market value of the stock declines nor establishes a duty to notify the pledgor of the decline in value." *Marriott Employees' Fed. Credit Union v. Harris*, 897 S.W.2d 723, 728 (Tenn. Ct. App. 1994).

In this case, the Bank owed no duty to the Lunans to sell the stock in contravention to the loan documents. As discussed above, the Bank, under the loan documents, only had the right to sell the collateral after a default and, thus, could not have owed a duty to sell the stock prior to a default. In addition, the Bank did not owe a duty to monitor the value of the stock or to notify the Lunans of a decline in value. Defendants have not alleged that the Bank breached any duty regarding keeping the physical possession of the stock certificates. Further, it is undisputed that while the loan documents gave the Bank the right to sell the stock pledged as collateral only upon a default, those same loan documents provided that the Bank was not required to do so. The loan documents control, and the Defendants failed to produce any evidence showing the existence of any genuine dispute as to any material fact.

In this case, the Bank showed, and the Trial Court properly found, that there was no genuine issue with regard to the material facts relevant to its claim and the counter-claim. In addition, the Bank showed, and the Trial Court properly held, that it was entitled to a judgment as a matter of law on the undisputed facts. The burden then shifted to Defendants to establish the existence of disputed material facts, or to affirmatively negate an essential element of the Bank's claim, or establish an affirmative defense. Defendants cannot rely upon those portions of their affidavit as stricken. They have submitted no other proof that would establish the existence of disputed material facts. Neither have they affirmatively negated an essential element of the Bank's claim, or established an affirmative defense. Therefore, the loan documents control, and we hold the grant of summary judgment to the Bank was proper.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellants, Bad Toys, Inc., Larry N. Lunan, and Susan H. Lunan, and their surety.

_____
D. MICHAEL SWINEY, JUDGE