IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 1, 2021

**TENNESSEE BANK & TRUST v. SCOTT MICHAEL BORUFF**

**Appeal from the Circuit Court for Davidson County**
**No. 19C2796      Hamilton V. Gayden, Jr., Judge**

_____

**No. M2021-00552-COA-R3-CV**

_____

A bank brought an action against a borrower for failure to repay a promissory note. The borrower asserted that the bank failed to mitigate its damages by failing to sell the shares of stock it held as collateral to pay off the loan at a time when the stock's value was high. After a bench trial, the trial court granted judgment in favor of the bank, holding that the parol evidence rule prevented consideration of his purported oral modification of the parties' agreement. Borrower appeals. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON, II, J., joined.

Walter N. Winchester and Ryen Monique Lamb, Knoxville, Tennessee, for the appellant, Scott Michael Boruff.

John R. Cheadle, Jr. and Mary Barnard Cheadle, Nashville, Tennessee, for the appellee, Tennessee Bank & Trust.

**OPINION**

This appeal involves an action to collect on a promissory note. On December 3, 2013, Scott M. Boruff executed a $3,000,000 note to Tennessee Bank & Trust ("TBT"). The note was a Variable Rate Commercial Revolving Draw Note, due on December 1, 2014, and all proceeds of the loan were to be used by Mr. Boruff for business or commercial purposes. The note required Mr. Boruff to make monthly interest payments, "calculated at a variable rate equal to the Wall Street Prime Rate . . . plus 1.50%" but never less than 4.75% per year.

To secure the note, Mr. Boruff pledged as collateral publicly-traded stock he held in Miller Energy, an oil and gas exploration company based in Knoxville of which Mr. Boruff was president and CEO. At the time he pledged the stock as collateral, his 3,344,925 shares of stock were valued at $27,562,182 and were held in a brokerage account at TD Ameritrade. Mr. Boruff executed a Pledged Asset Agreement for Collateral Loans that gave TBT control over the brokerage account, including the right to sell the stock as collateral at any time without Mr. Boruff's consent or knowledge.

Due to volatility in the oil and gas market in 2014, the value of the stock began to decrease in value. In light of those changes, the parties executed the first of nine modifications of the note in March 2014. The first modification increased the principal amount of the note to $3,300,000 and extended the maturity date from December 1, 2014, to October 1, 2015. This modification also set up a payment schedule that required Mr. Boruff to begin making his monthly interest payments in May 2014 (instead of January 2014), to pay off any principal balance over $2,000,000 on October 1, 2014, and to pay off any principal balance over $1,500,000 on March 31, 2015. It also imposed certain conditions for advances, including that the price of the stock be not less than $4 per share and that the principal balance of the note not exceed 20% loan-to-value between March 31 and October 1, 2014, 25% between October 1, 2014 and March 31, 2015, or 30% between March 31 and October 1, 2015.

In October 2014, the parties executed a second modification of the note, reducing the principal amount of the note to $1,600,000 and changing the conditions for advances so that the price per share of the stock had to be above $3.00 per share and the principal balance of the note could not exceed a 35% loan-to-value between October 1, 2014 and October 1, 2015. A year later, the parties executed a third modification, effective October 1, 2015, which provided that the amount of the note was reduced from $1,600,000 to $1,591.654.18 and the maturity date was extended from October 1, 2015 to December 3, 2015. Around the time of this modification, Miller Energy filed for bankruptcy; Mr. Boruff was no longer president and CEO but was serving as executive chairman of the company.

By a fourth modification with an effective date of December 3, 2015, the principal amount of the note was increased to $1,801,654.18; Mr. Boruff pledged real property as additional collateral; and the maturity date was extended to April 5, 2017. More written modifications were made on August 18, 2016 (increasing the principal to $1,807,554.18); September 2, 2016 (increasing the principal to $1,892,554.18); September 12, 2016 (increasing the principal to $2,207,554.18, providing that the note "shall become a draw down line of credit," and setting the conditions for certain amounts to be made available for Mr. Boruff); April 5, 2017 (extending the maturity date to June 5, 2017); and June 5, 2017 (reciting that "in exchange for Lender agreeing to extend the Note, Borrower has agreed to pledge his interest in 507 South Gay, LLC[,] as additional collateral for the Note"; fixing the interest rate at 4% per annum; modifying the maturity date to July 25, 2018; and providing a payment schedule).

Ultimately, Mr. Boruff did not pay off the note when it was due on July 25, 2018, and TBT filed a complaint on the note on November 26, 2019, seeking a judgment of $2,219,178.87 for the outstanding principal of $1,907,573.75 plus interest; TBT also sought its attorney's fees and costs. Mr. Boruff answered, and, with leave of the court, later amended his answer. He admitted most allegations but denied the following: that he had defaulted on the note; that he owed $1,907,573.75 in unpaid principal and $311,605.12 in interest; that he agreed in the note to pay TBT's attorney's fees and expenses; and that TBT was incurring attorney's fees at $275 per hour plus "the associated legal expenses of collection and this lawsuit." Mr. Boruff also asserted several affirmative defenses, stemming from his position that the Bank failed to mitigate its damages and also breached the contract by "unreasonably refusing to sell the stock securing the note upon reasonable and timely request by the Defendant," which he contended would have resulted in the balance on the note being paid in full.[1]

A bench trial was held in April 2021, at which four witnesses testified: three TBT representatives and Mr. Boruff.

Walker Choppin, Jr., who was senior vice president at TBT when the loan was made to Mr. Boruff but has since retired, testified that the loan was "a line of credit that Mr. Boruff could access for really whatever investment needs he might have" and that the loan was secured by shares of stock held in Miller Energy. Pertinent to Mr. Boruff's failure to mitigate damages defense, Mr. Choppin testified that at the December 2014 meeting between Mr. Boruff and bank leaders, Mr. Boruff did not ask the bank to sell the shares of stock to repay the loan. To the contrary, Mr. Choppin testified that Mr. Boruff "asked us not to sell." Moreover, Mr. Choppin testified that the loan was not in default at that time, that the bank never declared the loan to be in default, and that at no time did Mr. Boruff ever ask the bank to sell his shares of stock prior to them becoming "worthless" in October 2015.

Roddy Story, Jr., who was executive vice president and manager for commercial banking at TBT when the loan was made, testified that Mr. Boruff made a substantial payment in early October 2014 that reduced the balance owed on the loan to $22,780, but that over the next month, he made withdrawals amounting to a balance owed of $1,587,656.36. Mr. Story testified that he and Mr. Choppin and another bank official had a meeting with Mr. Boruff, Mr. Boruff's father-in-law, and their attorney, in December 2014 over "concern . . . because of what was happening in the oil industry." Mr. Story testified that Mr. Boruff was "somebody we had a lot of confidence in" and that "we came away feeling much better about the prognosis for the company . . . [and] relieved that he

---

[1] Mr. Boruff raised as his fourth affirmative defense that TBT "failed to sell the foreclosed property for its fair market value pursuant to T.C.A. 35-5-118" such that he was entitled to a reduction of the deficiency balance "because the Plaintiff's bid of $1,300,000.00 was materially less than the fair market value of such property at the time of the sale." This particular defense was not developed at trial by Mr. Boruff, ruled upon by the trial court, or briefed on appeal. Accordingly, we will not address it either.

thought the company would forbear the industry." Mr. Story testified that Mr. Boruff told the bank officials that he was asked by the board of Miller Energy to not have his shares pledged on any personal loans and asked to be given until May 2015 to get the bank "taken care of." Mr. Story testified that at no point in his working relationship with Mr. Boruff did Mr. Boruff ask the bank to sell the shares of stock in Miller Energy. He also agreed on cross examination that while the bank had the right to declare the loan to be in default, the bank did not declare a default, and that there was a distinction in the banking industry between there being an event of default versus the bank declaring a loan to be in default. He explained that TBT did not declare a default because there "seemed to be what we felt to be good faith and cooperation between us, and there also seemed to be possible solutions that would benefit [Mr. Boruff] and us."

Dan Andrews, Jr., president of TBT, testified that he was present for the meeting in December 2014 with Mr. Boruff, during which Mr. Boruff gave assurances that the matter would be resolved by May 2015. Mr. Andrews stated that he and the other bank officials "felt much better after the meeting" and that "[his] impression from the meeting itself was that they came out here to bring us up to speed on Miller, the industry, and the stock so that we wouldn't sell. And he never in that meeting asked me or us or anybody to sell the stock." Mr. Andrews testified about the relationship between Mr. Boruff and the bank: "at the end of the day . . . Scott seemed to have the wherewithal, the ties, the connections, the history, the professionalism to kind of continue, and whether the stock was there or not there, to make it work."

Mr. Boruff then presented his case and testified that he obtained the loan at issue in December 2013 at the same time as receiving a personal loan in roughly the same amount from CapStar Bank. The CapStar loan was secured by a first mortgage on his home and the Miller Energy stock.[2] He testified that an oil crisis began in the spring of 2014 and accelerated that fall, resulting in a change in value of the stock from $27,562,182 in December 2013 to $7,025.88 on December 31, 2015, and prompting "constant talk" with TBT about the value of the collateral that secured its note. Contrary to the testimony offered by the bank officials, Mr. Boruff testified that he asked the bank officials to sell the stock in December 2014 and did not understand why they did not do so. He explained, through a graph entered into evidence as Exhibit 15, that the stock was worth approximately $4 per share in October 2014 and $3 per share in November 2014.

---

[2] Mr. Boruff testified that CapStar Bank later sold the stock to satisfy its loan when the stock was valued at $3 per share (down from roughly $7 per share when the loan was first obtained) such that they "paid of[f] the $2,000,000 or $3,000,000 loan literally that day." The exhibits and the testimony do not make clear exactly when that sale occurred; however, Exhibit 15 shows that stock was valued at $3 per share in either October or November 2014, and we thus deduce that the sale occurred around that time.

At the conclusion of the trial, the trial court issued a ruling from the bench and entered an order memorializing that ruling on April 23, 2021, in which it made the following findings of fact and conclusions of law:

> Defendant did not contest that he borrowed the money from the Bank, that he signed the note and the nine modification agreements, or that the [B]ank calculated the balance due in principal and interest correctly. Defendant contended that he orally instructed the Bank to sell his collateral shares of stock in Miller Energy Resources, Inc. prior to the stock decreasing in value. Since the parol evidence rule precludes the oral modification of an unambiguous contract, the Court finds that defendant is justly indebted to plaintiff for an unpaid loan, with a principal balance due in the amount of $1,907,573.75, plus pre-judgment interest of $411,285.00, and plaintiff's reasonable attorney's fees.

The court ordered Mr. Boruff to pay TBT $2,318,285.75, accruing post-judgment interest at the default rate of 15% per annum, pursuant to Tenn. Code Ann. § 47-14-121.[3] It further ordered Mr. Boruff to pay $150,000 for TBT's attorney's fees and assessed the court costs against Mr. Boruff.

Mr. Boruff appeals, raising the following issue: "Whether the trial court erred when it failed to consider the defense . . . that [TBT] failed to mitigate its damages by failing and/or refusing to sell the stock collateral."

STANDARD OF REVIEW

"In an appeal from a bench trial, we review the trial court's findings of fact de novo with a presumption of correctness, unless the evidence preponderates otherwise." *Foster–Henderson v. Memphis Health Ctr., Inc.*, 479 S.W.3d 214, 223 (Tenn. Ct. App. 2015) (citing TENN. R. APP. P. 13(d)). If the trial court has not made a specific finding of fact on a particular matter, we review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). "[F]or the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). We also review the trial court's resolution on a question of law de novo, and no presumption of correctness attaches to the trial court's legal conclusions. *Bowden v.*

---

[3] Tennessee Code Annotated section 47-14-121(c) provides that "where a judgment is based on a statute, note, contract, or other writing that fixes a rate of interest within the limits provided in § 47-14-103 for particular categories of creditors, lenders or transactions, the judgment shall bear interest at the rate so fixed." The note provides that "In the event of any default under this Note, the Lender may, in its discretion, determine that all amounts owed to Lender shall bear interest at the lesser of Fifteen and No/100 percent (15.00%) per annum, or the maximum interest rate the Lender is permitted to charge by law."

*Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). "The interpretation of a contract is a matter of law that requires a *de novo* review on appeal." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) (citing *Hamblen Cty. v. City of Morristown*, 656 S.W.2d 331, 335-336 (Tenn. 1983)). Similarly, whether a party has satisfied its duty to mitigate damages is a matter of law and must be reviewed de novo. *B.W. Byrd Metal Fabricators, Inc. v. Alcoa, Inc.*, No. E2018-01750-COA-R3-CV, 2019 WL 3889798, at *6 (Tenn. Ct. App. Aug. 19, 2019).

ANALYSIS

"A court's initial task in construing a contract is to determine whether the language of the contract is ambiguous. . . . If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The parties do not dispute that a valid, enforceable, and unambiguous written contract existed between them. We also conclude that the note is unambiguous. Thus, we must look no further than the four corners of that document in determining whether the bank was entitled to judgment or not.

The note defines ten circumstances constituting default; pertinent to this case, "default" is defined as occurring when the Borrower "fails to make any payment on this Note or any other indebtedness to Lender when due" or "fails to perform any obligation or breaches any warranty or covenant to Lender contained in this Note or any present or future written agreement regarding this or any indebtedness of Borrower to Lender." The note also provides that a default occurs when the Borrower, any guarantor, or any other third party "causes Lender to deem itself insecure for any reason, or if Lender, for any reason in good faith deems itself insecure."

If an event of default occurred, the note provides that TBT was entitled to numerous remedies, including to cease making additional advances and to take possession of any collateral and sell, lease, or otherwise dispose of it to collect any deficiency balance with or without resorting to legal process. The note also provides that TBT could utilize one or more of its remedies "together, separately, and in any order."

The note also provides in section 5 that, among other things, "The modification or waiver of any of Borrower's obligations or Lender's rights under this Note must be contained in a writing signed by Lender."

There is no dispute that Mr. Boruff failed to pay amounts he owed when they were due. Mr. Boruff asserts that "TBT could have sold the stock in December of 2014 at the Defendant's request and the Note would have been satisfied" in support of his affirmative defense that TBT failed to mitigate its damages. The trial court summarily dismissed that defense by concluding that, based on section 5 of the note concerning modifications, consideration of Mr. Boruff's oral instructions to sell the stock were precluded by operation of the parol evidence rule.

- 6 -

The parol evidence rule does not prohibit consideration of evidence that does not contradict the written contract. *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 695 (Tenn. 2019). "[T]he parol evidence rule assumes that the parties deliberately chose to put their agreement in writing to avoid the uncertainties of oral evidence, including the possibility of false testimony as to oral conversations." *Farmers & Merchants Bank v. Petty*, 664 S.W.2d 77, 82 (Tenn. Ct. App. 1983). This Court discussed the parol evidence rule in *GRW Enterprises, Inc. v. Davis*:

> The parol evidence rule is a rule of substantive law intended to protect the integrity of written contracts. Since courts should not look beyond a written contract when its terms are clear, the parol evidence rule provides that contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract.
>
> The rule appears to be quite all-encompassing. However, the courts have been reluctant to apply it mechanically and have now recognized that it has numerous exceptions and limitations. Thus, the rule does not prevent using extraneous evidence to prove the existence of an agreement made after an earlier written agreement, or to prove the existence of an independent or collateral agreement not in conflict with a written contract. In each of these circumstances, the courts have conceived that the parol evidence is not being used to vary the written contract but rather to prove the existence of another, separate contract.

797 S.W.2d 606, 610-11 (Tenn. Ct. App. 1990) (citations omitted). Concerning oral modifications to existing contracts, this Court has stated:

> A modification to a contract is a change to one or more contract terms which introduces new elements into the details of the contract, or cancels some of them, but leaves the general purpose and effect of the contract undisturbed.
>
> After a written contract is made, it may be modified by the express words of the parties in writing or by parol, where both parties consent to such modifications. Generally, Tennessee courts follow the rule that allows contracts to be orally modified even if the contracts specifically state that the contract can only be modified in writing. Even where the written contract prohibits oral modifications of the agreement, oral alterations will still be given effect if otherwise valid, as men cannot tie their hands or bind their wills so as to disable them from making any contract allowed by law, and in any mode in which it may be entered into. A party's agreement to a modification need not be express, but may be implied from a course of conduct; this is true even where the agreement expressly specifies, as in this case, that the parties may only modify the agreement in writing.

*Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606, 611-12 (Tenn. Ct. App. 2011) (internal citations and quotations omitted). *But see* Tenn. Code Ann. § 47-50-112(c) (providing that if a note or other contract "contains a provision to the effect that no waiver of any terms or provisions thereof shall be valid unless such waiver is in writing, no court shall give effect to any such waiver unless it is in writing").

The evidence presented at trial was conflicting as to whether Mr. Boruff even requested TBT sell the stocks to pay off the loan.[4] He testified that he made such a request to TBT in December 2014; however, three bank representatives testified that he never made such a request, that he in fact asked them not to sell the stock, and that he represented to them that he would be able to repay the note without needing to resort to selling the stock.

Assuming, *arguendo*, that he did make such a request in December 2014, no default had yet occurred, since Mr. Boruff was in compliance with the terms of the note. At that time, the note, as modified in writing by the parties two months prior, provided that the principal amount of the note was reduced to $1,600,000. The maturity date remained October 1, 2015, as had been previously modified. The payment schedule also remained unaffected, which required Mr. Boruff to pay off the principal balance over $2,000,000 on October 1, 2014, and to pay off the principal balance over $1,500,000 on March 31, 2015. As of October 3, 2014, the principal balance was $872,780.00, and Mr. Boruff made a sizeable payment of $850,000 that day, which brought the principal down to $22,780. In October and November, he received additional advances from TBT totaling $1,592,268.98 and was making monthly interest payments. Exhibit 15 indicates that the value of the stock was close to $5,000,000 in December 2014.[5] The value of the collateral exceeded the amount of the loan and could not have been a basis for the bank to declare itself insecure at that time.

While the value of the stock was certainly falling at the time of his supposed request in December 2014, no event of default had actually occurred, so the bank had no right to sell the collateral to satisfy its debt. Accordingly, any action to sell the collateral by the bank at that time would have required a modification of the terms of the parties' agreement. There is no evidence of an oral agreement or behavior on the part of the parties to indicate that they had agreed to modify the terms of the parties' note to allow TBT to sell the

---

[4] We are perplexed by Mr. Boruff's inconsistent positions in his brief with respect to whether or not he wanted the collateral sold. For example, he says that he "instructed TBT to sell the stock" but also that he "desire[d] to not have it sold."

[5] The graphs in Exhibit 15 are imprecise as to dates and values, and the collective account statements from TD Ameritrade that Mr. Boruff placed in evidence as Exhibit 12 do not include a statement showing the value of the account for December 2014 (or any monthly statements for the relevant time period of November 2014 through February 2015).

collateral prior to a default, and the note itself would have required such a modification to be in writing, as found by the trial court.

When events of default did occur shortly thereafter, TBT still chose not to sell the stock, which brings us to a consideration of Mr. Boruff's contentions on appeal that he "was not asking the Trial Court to change, modify or alter the terms of the contract . . . [but] to require [TBT] to mitigate its damages." Mr. Boruff argues that because TBT failed to sell shares of stock at a time when they were much more valuable, the bank failed to eliminate or significantly reduce the balance due on his note, such that it should be "absolved in its entirety or reduced to $527,488.60."

"[T]he failure to mitigate damages is an affirmative defense, and the burden of proving a failure to mitigate falls on the defendant." *B.W. Byrd Metal Fabricators, Inc.*, 2019 WL 3889798, at *6. In *Memphis Light, Gas & Water Division v. Starkey*, this Court examined the doctrine of mitigation of damages, which dictates that:

> [O]ne who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover.
>
> *Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.*, 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971). Thus, a party injured by the wrongful act of another is under a legal duty to use reasonable efforts to minimize the loss and, to the extent that the injured party fails to do so, he or she cannot recover. *Id.; see also Kline v. Benefiel*, No. W1999-00918-COA-R3-CV, 2001 WL 25750, at *7 (Tenn. Ct. App. Jan. 9, 2001). The injured party is not, however, required to mitigate damages where the duty would impose an undue burden or be impossible under the circumstances. *See Kline*, 2001 WL 25750, at *7 (citing *Cummins v. Brodie*, 667 S.W.2d 759, 766 (Tenn. Ct. App. 1983)).

244 S.W.3d 344, 353 (Tenn. Ct. App. 2007). In *Forrest Const. Co., LLC v. Laughlin*, this Court observed:

> The critical factor in determining fulfillment of a plaintiff's duty to mitigate is whether the method which he employed to avoid consequential injury was reasonable under the circumstances existing at the time. The rule with respect to the mitigation of damages may not be invoked by a contract breaker "as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken

steps which seemed wiser or would have been more advantageous to the defaulter." As stated in McCormack, Damages, Sec. 35 (1935), "a wide latitude of discretion must be allowed to the person who by another's wrong has been forced into a predicament where he is faced with a probability of injury or loss. Only the conduct of a reasonable man is required of him."

337 S.W.3d 211, 230 (Tenn. Ct. App. 2009) (quoting *Salley v. Pickney Co.*, 852 S.W.2d 240 (Tenn. Ct. App. 1992)).

Mr. Boruff argues that TBT failed to mitigate its damages because "[t]he act of selling the stock, regardless of the Defendant/Appellant's desires to not have it sold and the Board of Miller Energy's desires not to have it sold, was not impossible nor duly burdensome." While the terms of the parties' agreement rendered it possible for TBT to sell the stock and apply those proceeds to the outstanding balance of the loan once an event of default occurred, those same terms did not require it to do so. Even if it had attempted to sell the stock shares, Mr. Choppin testified that it may not have yielded as high a value as asserted by Mr. Boruff:

> Q. The bank could have called the default and exercised its rights to sell that stock at that time in May of 2015, couldn't it?
> A. When you have that many shares of stock the price per share is really not indicative of what the value of that amount of stock is going to be, because it's like a triangle. The thinner the stock is traded, the bigger discount you'll have to take in order to move that many shares. So that was some of our issue, is that it would just take -- this was a small company, thinly traded, and it would be very difficult to repay that.

Importantly, the duty to engage in reasonable efforts to minimize a loss after a breach of contract does not impose a duty on the lender who holds shares of stock as collateral to sell the stock in order to satisfy the loan. In Tennessee, "the duty of reasonable care when applied to stock pledged as collateral refers to the physical possession of the stock certificates and neither imposes liability upon a lender if the market value of the stock declines nor establishes a duty to notify the pledgor of the decline in value." *First Tenn. Bank Nat'l Ass'n v. Bad Toys, Inc.*, 159 S.W.3d 557, 564 (Tenn. Ct. App. 2004) (quoting *Marriott Emps.' Fed. Credit Union v. Harris*, 897 S.W.2d 723, 728 (Tenn. Ct. App. 1994)). In *Marriott Employees' Federal Credit Union*, this Court adopted the rule set forth by the Seventh Circuit Court of Appeals that a lender who merely accepts stock as collateral does not "undertake to act as an investment adviser, although imposing a duty on the lender to sell the stock at the 'reasonable' time would foist that role upon it." 897 S.W.2d at 727 (quoting *Capos v. Mid–America Nat'l Bank,* 581 F.2d 676, 680 (7th Cir. 1978)).

In this case, TBT received stock as collateral and did not assume an obligation to act as an investment adviser. Thus, it was under no duty to sell the stock at a reasonable

time to secure repayment of the loan. As the value of the collateral continued to decline, the evidence showed that TBT took reasonable steps to protect itself from loss by regularly communicating and collaborating with Mr. Boruff and seeking additional collateral, which he provided in the form of a deed of trust on his real property in Knox County and a pledge of his interest in an LLC. Mr. Andrews testified that the bank did not sell the stock because Mr. Boruff "asked us not to" and also because Mr. Boruff "had the wherewithal in his financial statement with other assets to add to that in place of the stock." The parties memorialized their efforts to get the loan repaid in a mutually beneficial way with written modifications to their initial agreement. Though Mr. Boruff benefitted from the bank's forbearance at the time, he now asserts that it is evidence of "ulterior motives" and a failure to mitigate damages. On the record presented, we conclude that Mr. Boruff has not carried his burden to demonstrate that TBT's actions were unreasonable; accordingly, his failure to mitigate damages defense fails.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Scott Michael Boruff, for which execution may issue if necessary.


_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE