**PEOPLE FIRST OF TENNESSEE, et al., Plaintiffs,**

v.

**CLOVER BOTTOM DEVELOPMENTAL CENTER, et al., Defendants.**

Nos. 3:95–1227, 3:96–1056.

United States District Court, M.D. Tennessee, Nashville Division.

May 28, 2010.

Earle J. Schwarz, Glankler Brown, PLLC, Memphis, TN, Jack Derryberry, Michael L. Roden, Office of the United States Attorney, Nashville, TN, Judith A. Gran, Philadelphia, PA, R. Jonas Geissler, Matthew Donnelly, Department of Justice, Washington, DC, for Plaintiffs.

Dianne Stamey Dycus, Tennessee Attorney General's Office, Nashville, TN, Jonathan P. Lakey, Pietrangelo & Cook, PLC, Memphis, TN, for Defendants.

### MEMORANDUM

ROBERT L. ECHOLS, District Judge.

The State Defendants ("the State"), with the permission of the Court on motion (Docket Entry Nos. 964, 971), filed an Emergency Motion To Compel Quality Review Panel To Comply With Settlement Agreement Or, In The Alternative, For Declaratory Relief. (Docket Entry No. 965.) Plaintiffs and Class Representatives People First of Tennessee, *et al.*, filed a Preliminary Response (Docket Entry No. 970) and a Response. (Docket Entry Nos. 974 & 975 (duplicate filing).) The Parent Guardian Associations also filed a Response. (Docket Entry No. 973.) The United States filed a Response and attached its own Cross Motion To Enforce Settlement Agreement. (Docket Entry Nos. 972 & 972–1.) The United States, however, did not obtain this Court's permission to file the Cross Motion. Even so, the Cross Motion may be filed and it will be considered. The Court heard argument on these motions on Thursday, May 13, 2010.

The relief requested in the State's motion is circumscribed. The State requests entry of an Order: (1) "compelling the Quality Review Panel to complete its review of the transition plans for the residents of Clover Bottom Developmental Center within twenty (20) days from receipt"; and (2) "precluding the Quality Review Panel from finding a major deficiency with any proposed transition to Mur–Ci Homes solely on the basis that it is a large congregate care facility." If the Court denies the State relief on these two requests, the State alternatively asks for a declaratory Order "clarifying that neither the Settlement Agreement nor federal law precludes class members from choosing to receive services from a congregate care facility even if services could be provided in a more integrated setting." (Docket Entry No. 965, State's Emergency Motion at 2–3.)

The United States' cross motion seeks (a) denial of the State's motion to overrule the QRP's determination that Mur–Ci Homes is not a community placement; (b) an order directing the State, in accordance

with the Settlement Agreement, to transfer promptly to the most integrated settings all residents who have been deemed appropriate to be served in the community, and (c) an order forbidding the State to transfer to an institutional setting any class member who can be served in a more integrated setting.

In late 2009, the Division of Intellectual Disabilities ("DIDS") of the State of Tennessee announced its intention to close Clover Bottom Developmental Center ("CBDC") by June 30, 2010, due to a fiscal crisis facing the State of Tennessee. In its Emergency Motion and supporting documents, the State cited the imminent June closing of CBDC as the reason why this Court should grant expedited review. The State represented that, if residents could not be transferred from CBDC as planned, the State would not be able to meet its intended downsizing of CBDC by June 30, and the State would be required to reinstate 125 staff members at an expected cost to the State of more than $3 million. According to the State, delay would create an extreme hardship on the people supported, their families, the staff and the State. At oral argument the State conceded it does not plan to close CBDC by June 30. In light of the State's concession, the Court agrees with other parties that there does not appear to be an emergency demanding the Court's attention. Nonetheless, the Court must rule on the pending motions.

## I. *BACKGROUND*

### A. Transition of CBDC residents to Mur–Ci Homes

The State represents that, after announcing in late 2009 its intent to close CBDC, it made an effort to provide information about available alternative placements so that families and conservators could locate qualified providers and consider available options to furnish Medicaid services to CBDC residents. (Docket Entry No. 968, Brightwell Decl. ¶ 15.) In addition to letters and personal telephone calls to conservators and family members of CBDC residents and contact with the Parent Guardian Associations, the State also invited them to attend two provider fairs held on December 12, 2009 and January 23, 2010. (*Id.* ¶¶ 16–17.) Forty-five (45) service providers attended the first provider fair, as did conservators and/or families for forty-one (41) CBDC residents. Providers of Intermediate Care Facilities for the Mentally Retarded ("ICF/MR providers") and of Home and Community Based Services ("HCBS waiver providers") from across the state attended this event. At the second provider fair, representatives from the ARC attended, as well as representatives from several Independent Support Coordination agencies. These individuals were present to inform families of the differences between ICF/MR and waiver homes. (*Id.*) Through these efforts, the State provided conservators and families choices between waiver and ICF/MR services, with access to larger and smaller facilities. (*Id.* ¶ 18.)

As of April 23, 2010, nineteen (19) CBDC residents selected and were accepted to transfer to Mur–Ci Homes.[1] Of these 19 people, twelve (12) have mobility concerns and six (6) must be fed by a tube. Fifteen (15) individuals have epilepsy and all 19 have profound deficits in adaptive

---

1. The United States provided a chart it received from the State identifying individuals to be transitioned to Mur–Ci Homes from CBDC. (Docket Entry No. 972–2, Adelona Decl., Ex. A.) The names of the individuals are redacted and only their initials are used, but the Court counts eighteen (18) persons, not nineteen (19), listed on this chart. Although the chart lists only 18 persons, the Court will

behaviors. The needs of these 19 individuals are similar to the needs of other individuals currently being served by Mur–Ci Homes. (*Id.* ¶ 19.) Mur–Ci Homes' admissions committee did not accept some CBDC residents who applied to transfer to Mur–Ci Homes because the admissions committee found those persons may present a danger to the vulnerable people who were accepted from CBDC or who are currently supported by Mur–Ci Homes. (*Id.*)

Of the 19 CBDC residents scheduled to transfer to Mur–Ci Homes, thirteen (13) have been recommended for community placement by their interdisciplinary teams ("IDTs") and six (6) have not been recommended for community placement by their IDTs. These 6 individuals were referred for independent professional evaluation ("IPE"). The IPE found that three (3) citizens were not appropriate for community placement and three (3) were appropriate for community placement. The IDTs, however, disagreed with the IPE about the 3 persons found to be appropriate for community placement, and the IDTs have continued to recommend that these 3 individuals are not appropriate for community placement. (*Id.* ¶ 20.) Thus, there is no dispute by the parties that, of the 19 individuals who have chosen transfer to Mur–Ci Homes, 3 have not been recommended for community placement, 13 have been recommended for community placement, and 3 have been recommended for community placement by the IPE, but the residents' IDTs have continued to take the position that these individuals are not appropriate for community placement.

For each of the 19 CBDC residents, even those that have been recommended for community placement, the conservators have chosen Mur–Ci Homes as the provider they want to care for the CBDC residents. These conservators were given information about other providers and facilities that might be available to provide residential services for CBDC residents in a more integrated community setting. Two (2) of the 19 persons scheduled to transition to Mur–Ci Homes were offered the choice to move to one of the state-run, community-based ICF/MRs, but declined that option.[2] (*Id.* ¶ 21.)

Mur–Ci Homes is a private not-for-profit agency that is licensed as an Intermediate Care Facility for people with Mental Retardation (ICF/MR) by Tennessee Department of Health and Tennessee Department of Mental Health and Developmental Disabilities. (*Id.* ¶ 6.) Mur–Ci Homes has operated a forty-bed facility in Nashville since 1960. In October 2007, a Certificate of Need ("CON") was granted for the program to expand. The CON was granted to increase the number of people sup-

---

assume that 19 CBDC residents chose Mur–Ci Homes as a provider.

**2.** The PGA questions the factual basis for the State's statements that all of the 19 conservators were offered the choice of other more integrated settings and specifically chose to receive services at Mur–Ci Homes because the State identifies only two individuals who declined placement in a community-based ICF/MR in favor of placement at Mur–Ci Homes. PGA alleges that when the conservators chose ICF/MR for their preference of residential care they did not know that Mur–Ci Homes was their only choice and there

were no alternate community placement sites available. Further, the PGA contends that transition plans have not been completed for all 19 class members, and thus, it is not accurate to say that 19 residents have chosen Mur–Ci Homes or that there is no dispute that conservators have specifically chosen Mur–Ci Homes.

The Court agrees with the PGA that the State's factual showing is minimal. For the purpose of construing the Settlement Agreement, however, the Court assumes that all 19 persons chose Mur–Ci Homes.

ported by thirty-two (32). The CON was granted so that Mur–Ci Homes could serve people who were transitioning from the state developmental centers, including CBDC. (*Id.* ¶ 7.)

Mur–Ci Homes currently serves forty-three (43) people with profound or severe intellectual disabilities. A majority of the people who are supported by Mur–Ci Homes have multiple and significant disabilities. Of the 43 people supported, thirty (30) are non-mobile, twenty-two (22) must be fed by a tube, eleven (11) are vision impaired or partially sighted, and forty (40) are incontinent. (*Id.* ¶ 8.)

All of Mur–Ci Homes' houses and facilities are fully accessible for people with ambulation concerns. Twelve (12) of the nineteen (19) CBDC residents have mobility problems. Mur–Ci Homes has wheelchair vehicles to transport people to community activities. Each person who will transition to Mur–Ci Homes will live in a new building and will have his or her own private bedroom. (*Id.* ¶ 10.) Mur–Ci Homes has a new specially designed day center off campus which is attended daily by Mur–Ci Homes residents.[3] The facility is completely accessible and includes a ceiling track system so that people can use an indoor swimming pool on a regular basis. (*Id.* ¶ 11.)

On May 13, 2009, Mur–Ci Homes admitted the first person into the new beds. This person is a member of the class in the Arlington lawsuit. Since that time, two other people have been admitted from Arlington. As a result of each of those admissions, extensive post placement monitoring has been done by both staff from the Middle Tennessee Regional Office ("MTRO") and staff from the court monitor's office. Any issues noted by either entity have been addressed and remediated by Mur–Ci Homes in a timely and responsible manner.[4] (*Id.* ¶ 12.) Any CBDC class member who transitions to Mur–Ci Homes would undergo similar post-placement monitoring by staff from the MTRO. Upon completion of the post-placement monitoring period, final reports are submitted to the Quality Review Panel. (*Id.* ¶ 13.)

In July 2006, state law was modified to require that all private ICF/MR agencies follow the Protection from Harm policies and procedures that other DIDS community agencies are required to follow. Therefore, Mur–Ci Homes is complying with the policies. (*Id.* ¶ 14.)

According to James R. Finch, Ed.D., Deputy Commissioner, Division of Intellectual Disabilities Services, in order for there to be a continuum of care available to serve persons with intellectual disabilities, there is a need to offer services to

---

3. In the briefs, this facility is referred to as the Mur–Ci Activity Center ("MAC").

4. People First attached to its Preliminary Response an April 29, 2010 report of a review of Mur–Ci Homes conducted by the court monitor's office in the Arlington lawsuit, *United States v. Tennessee*, No. 92–2062 (W.D.Tenn.). (Docket Entry No. 970–3.) This report identified a number of deficiencies in the care provided to the 3 citizens admitted to Mur–Ci Homes from Arlington, including program deficiencies at the day center, lack of documentation of medication administration, failure to track seizure activity, failure to supply needed equipment at mealtime, deficient staff training practices, failure to provide sufficient staff at mealtime, and failure to provide training and habilitative activities. The monitor noted:

> Mur–Ci Homes is slated to receive 19 new individuals from Clover Bottom. It was unclear if they will all be attending the MAC but this addition will require Mur–Ci to re-evaluate the current structure of the MAC staffing, group size, and domain rotation.

(Docket Entry No. 970–3 at 1.)

some people in a larger, more congregate care setting, such as Mur–Ci Homes. (Docket Entry No. 967, Finch Decl. ¶ 8.) In such a setting, there is ready availability of additional staff or nursing supports during a medical emergency. The level of stimulation that a larger group setting offers may assist a person to enhance social skills and personal awareness. In his experience, some families and/or conservators frequently feel that a person is less vulnerable to abuse and neglect in a setting where more staff is available. (*Id.*)

## B. Quality Review Panel Report

After the State filed its motion for leave to file the Emergency Motion on the late afternoon of May 6, 2010, the Quality Review Panel ("QRP") submitted a written report, entitled "QRP Review Mur–Ci Homes May 5, 2010," to Magistrate Judge Joe B. Brown late on May 6. (Docket Entry No. 969–1.) The Court considers the content of the QRP's report because it was submitted directly to Magistrate Judge Brown, who has been assisting the Court with mediation of certain aspects of this case, copies of the report were submitted to the Court by the State and People First, (Docket Entry Nos. 969–1, 970–2), and all parties refer to the report in their arguments.

The QRP stated in its written report that, on April 9, 2010, it received the first of nine (9) transition plans for CBDC class members to be placed in Mur–Ci Homes. The QRP visited Mur–Ci Homes on May 5, 2010, to observe, to discuss with staff the operations and services provided, and to tour the residential buildings and the MAC day program, which is located approximately six (6) miles from the main campus. Mur–Ci Homes currently provides residential services to forty-three (43) individuals with developmental disabilities, thirteen (13) of whom are school-age children. Nine (9) residential buildings are clustered together, each with the capacity to provide living quarters for eight (8) individuals. If completely occupied, the facility would serve seventy-two (72) persons. Four (4) of the residential buildings were constructed recently after the Health Services and Development Agency awarded a Certificate of Need ("CON") for expansion.[5]

According to the QRP report, medical services and supports are an integral part of the operation of Mur–Ci Homes. The Medical Director is a consultant physician who is also the Director of Geriatric Inpatient Services at Vanderbilt University Medical Center. A consultant nurse practitioner is also a part-time member of the medical support team. Other medical consultants, mostly affiliated with Vanderbilt University, provide specialty services as needed. A full-time Registered Nurse is the Director of Nursing and the Assistant Director of Nursing is a Licensed Practical Nurse. There are fourteen (14) nurses on the Mur–Ci Homes staff and at least two (2) nurses are on duty during the day and evening shifts and one (1) nurse is on duty overnight.

Mur–Ci Homes staff informed the QRP that habilitation services and supports are provided at the residential buildings and at the day program site. All adults who live

---

5. At the time the CON was sought, Michael S. Lottman, then the Chairman of the QRP, sent a letter dated October 19, 2007, to the Health Services and Development Agency expressing concern that the new construction at Mur–Ci Homes was not consistent with the requirements of the Settlement Agreement regarding community placement. (Docket Entry No. 969–1 at 10–12.) Mr. Lottman expressed the same sentiment in a November 9, 2007 letter sent to Steven Norris, who was at that time the Deputy Commissioner of the Division of Mental Retardation Services. (Docket Entry No. 969–1 at 13–14.) Despite Mr. Lottman's opposition, the CON was issued and the construction was completed.

at Mur–Ci Homes receive day services at the MAC. All individuals who attend the MAC daily are assigned to a group of six (6) people and the group rotates from one activity to the next between 9:30 a.m. and 1:30 p.m., when the individuals board the bus and return to the main campus. The activity rooms include the music room, interactive room, news room, hobby hut, therapy room, physical enrichment room, and snoozelen room. By participating in three (3) activities per day, each group rotates through every activity at least once during the week. Lunch is prepared at the main campus central kitchen and transported to the MAC. Although staff indicated that trips into the community do occur, most of each person's day is spent at the residence, at the MAC, or traveling to and from these facilities.

Food at Mur–Ci Homes is prepared in the main kitchen, just off the day room of the residential building that houses eight (8) individuals and the administrative offices. Once prepared, food is delivered to various buildings throughout the campus. One of the four (4) new residential buildings has complete kitchen facilities and the food for those 4 buildings will be prepared at that kitchen and distributed. Each building has a toaster oven, microwave, and a refrigerator, but there are no plans for food preparation in the residential buildings.

The QRP was impressed with the dedication and knowledge of the staff of Mur–Ci Homes and felt they were obviously committed to the provision of services and supports to the individuals residing at the facility. Nonetheless, the QRP found that Mur–Ci Homes is a large, and soon to be larger, facility where up to 72 individuals with disabilities may live. The facility and its services are separate from and not integrated into the local community. With the number of individuals supported together, both in the residential services and the day services, activities are provided to groups rather than to individuals. Routines are dictated by schedules, and opportunities for integration, independence, and inclusion with citizens who are not disabled are minimal. The QRP found that the 9 residential units constitute a congregate living environment and that the facility is not typical of homes found in communities throughout Tennessee. Based on the terms of the Settlement Agreement and professional judgment, the QRP gave its opinion "that Mur–Ci Homes is not a community placement as described in the [Settlement] Agreement." (Docket Entry No. 969–1 at 7.)

The QRP also stated in its report that it had reviewed transition plans for nine (9) class members recommended for placement at Mur–Ci Homes, eight (8) of whom had been recommended for community placement. Given the QRP's opinion that Mur–Ci Homes is not a community placement, the QRP found that a major deficiency exists in the transition plans for 8 of the 9 class members. Additionally, the QRP identified other major deficiencies in the transition plans for seven (7) of the individuals recommended for placement at Mur–Ci Homes. The identified deficiencies included such things as the need for a three-person transfer lift without the appropriate ratio of staff, lack of jobs and job coaches, lack of a behavior support plan for an individual with a history of physical aggression, lack of a day program for a senior individual, failure to identify the independent support coordinator for the individual, and failure of the independent support coordinator to certify the transition plan as required by the Settlement Agreement. The QRP indicated it would continue to review the transition plans with the staff of the Middle Tennessee Regional Office to discuss the deficiencies identified.

## II. ANALYSIS

### A. State's motion to compel QRP to review transition plans

■ The State filed its motion on the late afternoon of May 6, before the QRP filed its report later that evening. The report confirms that the QRP reviewed the nine (9) transition plans for CBDC residents submitted to it by that date.

The Settlement Agreement provides: "The Quality Review Panel will review each individual placement prior to such placement occurring. The Panel shall complete its review and report to the IDT within twenty (20) days of receiving the ISTP and certification from the IDT unless the Panel requests additional time for a particular placement." (Docket Entry No. 327, Settlement Agreement, V.A.12.) The State did not make a showing that the QRP failed to request additional time to review the transition plans if, in fact, the QRP did not review the transition plans within 20 days of receipt, a fact which is not apparent from the record before the Court. The State conceded at oral argument that the State does not intend to close CBDC by June 30, 2010, and the State did not make a showing that it suffered any prejudice due to the amount of time the QRP utilized to review the 9 transition plans. The Court notes the Settlement Agreement also provides: "Under no circumstances will the speed or type of placement be governed by anything other than the interests of the citizen being placed." (Settlement Agreement V.A.9.) Further, the State has not made a showing that additional transition plans for CBDC residents have been submitted to the QRP, or that the QRP has failed to review additional transition plans in a timely manner in accordance with the Settlement Agreement. Therefore, without an active controversy before the Court requiring resolution, the Court will deny the State's motion to compel the QRP to complete its review of the transition plans for the residents of Clover Bottom Developmental Center within twenty (20) days of receipt.

### B. State's motion to preclude QRP from finding major deficiency on Mur–Ci Homes

■ The State next requests entry of an Order precluding the QRP from finding a major deficiency in the proposed transition of CBDC residents to Mur–Ci Homes solely on the basis that Mur–Ci Homes is a large congregate care facility. At issue is whether the QRP overstepped its authority as granted in the Settlement Agreement when it offered an opinion in the May 6 report "that Mur–Ci Homes is not a community placement as described in the [Settlement] Agreement[,]" and "[g]iven the Panel's opinion that Mur–Ci Homes is not a community placement, a major deficiency exist[s] in the transition plans for eight of the nine class members." (Docket Entry No. 969–1 at 7.) According to the Settlement Agreement, "[w]here the Panel determines that there are major deficiencies with a placement, the placement shall not occur until all the identified major deficiencies are corrected." (Settlement Agreement, X.A.3.c.) By finding a major deficiency exists because of Mur–Ci Homes' status as a large, congregate ICF/MR, the QRP has effectively precluded the forward progression of any plans to transition CBDC residents who have been approved for community placement to Mur–Ci Homes, even though conservators for those residents have chosen Mur–Ci Homes as the citizens' Medicaid provider.

The Court first notes that this portion of the State's motion does not affect three (3) of the 19 CBDC residents slated for transition to Mur–Ci Homes who have not been recommended for community placement, either by their IDTs or the IPE. It ap-

pears to the Court that the only issue with regard to those 3 individuals is whether Mur–Ci Homes is an adequate placement. (Settlement Agreement, X.A.3.c.) The Court has no information about whether transition plans for these 3 individuals have been submitted to the QRP for review. No party has offered any reason why plans to transition those three individuals may not proceed in accordance with the Settlement Agreement. The Court considers the State's motion, then, as it applies to the 16 CBDC residents who have been found appropriate for community placement, either by their IDTs or by the IPE, even if, as to 3 residents, the IDTs disagree with the findings of the IPE that community placement is appropriate.

To determine whether the QRP has executed or exceeded its role, the Court must look to the terms of the Settlement Agreement. A settlement agreement is essentially a contract, so the Court must be guided by contract principles in interpreting the agreement. *See In re Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d 619, 622 (8th Cir.2001). The interpretation of a contract is a question of law and depends upon the intent of the parties. *Pitt v. Tyree Org. Ltd.*, 90 S.W.3d 244 (Tenn.Ct.App.2002). "Since courts should not look beyond a written contract when its terms are clear, the parol evidence rule provides that contracting parties cannot use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract." *First Tennessee Bank Nat'l Assn. v. Bad Toys, Inc.*, 159 S.W.3d 557, 563 (Tenn.Ct.App.2004).

The QRP was created by the parties, and its two primary functions are "to review placement decisions and planning" and "to assist in monitoring the implementation of this Agreement." (Settlement Agreement X.A.1 & X.A.2.) When reviewing placement decisions, the QRP "shall determine the adequacy of the placement and ensure that the placement meets the individual needs of each citizen." (Settlement Agreement X.A.3.c.) In its brief and at oral argument, the State acknowledged that the Settlement Agreement places this authority in the QRP. (Docket Entry No. 966, State's Memorandum at 4.)

The State is bound by the Settlement Agreement to "provide each citizen appropriate developmental services in the most integrated setting consistent with his or her needs, and in a manner which promotes independence, enhances dignity and is as consistent as possible with the Guiding Principles of this Agreement." (V.B.1.) The "most integrated setting appropriate" language is taken from the regulation promulgated under Title II of the Americans With Disabilities Act, which requires that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The regulation also provides: "Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept." 28 C.F.R. § 35.130(e)(1).

The State is required by the Settlement Agreement to

develop community living arrangements for all citizens residing at the institutions for whom such living arrangements are called for by the individualized evaluations set forth in Section IV.A, ... together with the community services necessary to provide the citizens with adequate medical care and supports and services, as defined by the individual person-centered evaluations and planning process that is consistent with pro-

fessional judgment, until such time as the citizen no longer is in need of such care and services.

(Settlement Agreement V.B.2.) The Settlement Agreement does not expressly define what the parties meant by a "community placement" or a "community living arrangement." But the Settlement Agreement does provide:

> Community placements shall provide a safe and humane environment in which individuals are provided daily opportunities to learn, develop and maintain skills. All services, including medical and other health related services including, but not limited to, physical therapy, occupational therapy, necessary technology, dental, speech, visual, hearing, nutrition, and psychology, must be adequate and appropriate to meet the individual needs of the citizens."

(Settlement Agreement V.A.13.)

Because the QRP is charged under the Settlement Agreement with reviewing placement decisions, the QRP is necessarily required to determine whether a proposed community placement will provide the safe and humane environment and the necessary services just described. The QRP must also determine whether a particular placement will provide the citizen "appropriate developmental services in the most integrated setting consistent with his or her needs, and in a manner which promotes independence, enhances dignity and is as consistent as possible with the Guiding Principles of this Agreement." (V.B.1.)

The QRP determined that Mur–Ci Homes does not provide citizens with the most integrated setting suitable to meet the needs of the individuals as recommended by their IDTs or by the IPE, and the State concedes that this is so. (Docket Entry No. 966, State's Memorandum at 7.) The Court concludes as a matter of law

that the QRP did not overstep its bounds when it stated an opinion based on the professional judgment of its members that Mur–Ci Homes is not a community placement as described in the Settlement Agreement. The QRP's opinion falls well within the QRP's charged role "to review placement decisions and planning," to "determine the adequacy of the placement and ensure that the placement meets the individual needs of each citizen," and to monitor the implementation of the Settlement Agreement. Accordingly, the Court will deny the second part of the State's motion seeking to preclude the QRP "from finding a major deficiency with any proposed transition to Mur–Ci Homes solely on the basis that it is a large congregate care facility." The impact of the QRP's finding of a major deficiency with regard to the status of Mur–Ci Homes as a large, congregate care facility, however, requires the Court to consider the State's alternative motion, which seeks declaratory clarification of whether the QRP's finding of a major deficiency can effectively preclude any CBDC resident from transferring to Mur–Ci Homes.

## C. The State's alternative motion on the issue of citizen choice

■ The State asks for a declaratory Order that neither the Settlement Agreement nor federal law precludes class members from choosing to receive services from a congregate care facility even if services could be provided in a more integrated setting.

The State represents that all of the class members at CBDC have been admitted under state law through voluntary admission, and no class member residing at CBDC is in the legal custody of the State. Further, the class members residing at CBDC have been found to be eligible under the Medicaid Act for ICF/MR services.

The Medicaid Act provides that any individual eligible for medical assistance may obtain "such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required … who undertakes to provide him such services[.]" 42 U.S.C. § 1396a(a)(23)(A). The qualified provider must be willing to furnish services to the recipient. *Id.;* 42 C.F.R. § 431.51(b)(1). The Medicaid recipient also has the right to choose whether to receive services through an ICF/MR or a Home and Community–Based Services Waiver. 42 U.S.C. § 1396n(c)(2)(C); 42 C.F.R. § 441.302(d); Settlement Agreement V.A.4.

In *Harris v. Olszewski*, 442 F.3d 456, 461–462 (6th Cir.2006), the Sixth Circuit interpreted § 1396a(a)(23) as follows:

> First, in giving "any individual eligible for medical assistance" a free choice over the provider of that assistance, the statute uses the kind of "individually focused terminology" that "unambiguously confer[s]" an "individual entitlement" under the law. *Gonzaga* [*University v. Doe*], 536 U.S. [273] at 283, 287, 122 S.Ct. 2268 [153 L.Ed.2d 309 (2002)]. And by saying that "[a] State plan … must … provide" this free choice, the statute uses the kind of "rights-creating," *id.*, "mandatory language," *see Westside Mothers*, 289 F.3d at 863, that the Supreme Court and our court have held establishes a private right of action. It is also clear that the right is vested "in the class of beneficiaries to which [plaintiffs] belong[ ]," *City of Rancho Palos Verdes* [*v. Abrams*], [544 U.S. 113] 125 S.Ct. [1453] at 1458 [161 L.Ed.2d 316 (2005)], namely individuals eligible for Medicaid coverage. The freedom-of-choice provision, in other words, "gives recipients the right to choose among a range of qualified providers[ ] without government interference." *O'Bannon v. Town Court Nurs-

*ing Ctr.*, 447 U.S. 773, 785, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (emphasis removed)[.]

Thus, there can be no doubt that, under the Medicaid Act, CBDC residents who are eligible for and receive Medicaid assistance from the State have freedom of choice to choose among a range of qualified providers.

People First and the United States contend that the unjustified isolation of persons with developmental disabilities in large, congregate institutions is a violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq. See Disability Advocates, Inc. v. Paterson*, 653 F.Supp.2d 184 (E.D.N.Y.2009) (finding after bench trial that private congregate care facilities for people with mental illness constituted institutions and did not enable interactions with non-disabled people to the fullest extent possible); *Messier v. Southbury Training School*, 562 F.Supp.2d 294, 339–340 (D.Conn.2008). The State concedes Mur–Ci Homes qualifies as an institution under the Medicaid Act. The United States also contends that the State violated the Settlement Agreement when it offered "discriminatory segregation to community-approved class members" in violation of the ADA. (Docket Entry No. 972, United States' Response at 7.)

The intersection of citizen choice and the ADA was addressed by the Supreme Court in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). The issue presented in that case was "whether the proscription of discrimination [under Title II of the ADA] may require placement of persons with mental disabilities in community settings rather than in institutions." *Id.* at 587, 119 S.Ct. 2176. The Supreme Court answered the question with a "qualified yes." *Id.* The ADA requires placement of per-

sons with mental disabilities in community settings rather than institutions "when the State's treatment professionals have determined that community placement is appropriate, *the transfer from institutional care to a less restrictive setting is not opposed by the affected individual,* and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* (emphasis added).

While recognizing that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment[,]" the Supreme Court "emphasize[d] that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." *Id.* at 601–602, 119 S.Ct. 2176. "Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it." *Id.* at 602, 119 S.Ct. 2176 (construing 28 C.F.R. § 35.130(e)(1) (1998)). The Court said that "the ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk[,]" and for some individuals, "no placement outside the institution may ever be appropriate." *Id.* at 604–605, 119 S.Ct. 2176 (citing "Brief for American Psychiatric Association et al. as *Amici Curiae* 22–23) ('Some individuals, whether mentally retarded or mentally ill, are not prepared at particular times—perhaps in the short run, perhaps in the long run—for the risks and exposure of the less protective environment of community settings'; for these persons, 'institutional settings are needed and must remain available.'); Brief for Voice of the Retarded et al. as *Amici Curiae* 11 ('Each disabled person is entitled to treatment in the most integrated setting possible for that person—recognizing that, on a case-by-case basis, that setting may be in an institution.'); *Youngberg v. Romeo,* 457 U.S. 307, 327, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (Blackmun, J., concurring) ('For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know.')." The Supreme Court thus acknowledged that states must maintain a range of facilities for the care and treatment of persons with diverse mental disabilities and the states have an obligation to administer services with an even hand. *Id.* at 597, 102 S.Ct. 2452.

The Settlement Agreement drafted by the parties similarly recognizes and emphasizes the decisional control retained by the class members, and their family members, guardians and conservators, to determine the direction of care when receiving Medicaid assistance. The Preamble and Guiding Principles in Section II of the Settlement Agreement, although not binding, set the tone for the entire Settlement Agreement. The Preamble's opening paragraph provides:

> The parties enter into this Settlement Agreement recognizing that their overriding common interest is in assuring that Tennessee's citizens with developmental disabilities are provided reasonable opportunities to grow and develop, exercise independence, and lead full and productive lives in a safe environment. This Agreement requires the restructuring and enhancement of Tennessee's state-wide delivery of services to these citizens in a way *that recognizes the individuality of each citizen and understands the critical role of family members, guardians, and others who provide support and care. . . .*

(Settlement Agreement at 2 (emphasis added).) Of the sixteen (16) guiding principles that follow the opening paragraph of the Preamble, the three quoted below speak specifically to the individual choice of the class member:

B. All decisions regarding services for citizens must be person-centered, driven by the individual citizens, family members, guardians, advocates, and other interested persons, and made on an individualized basis by appropriate interdisciplinary teams of competent and qualified professionals with input from those persons.

\*     \*     \*

E. All citizens must direct their own lives and be enabled to make meaningful choices about matters that are important to the person. *Decisions about services and support for each citizen shall be made by the citizen with the support of parents, guardians, friends and advocates.*

\*     \*     \*

O. *Each citizen will have a reasonable opportunity to choose from appropriate service providers, his or her living environments, his or her roommates, and his or her qualified support staff.*

(Settlement Agreement at 3–5, emphasis added).

Likewise, citizen choice appears in several of the substantive and binding provisions of the Settlement Agreement, as listed below:

All assessments made pursuant to this section shall be based upon the individual needs and choices of the citizen and not on present availability of services.

(Section IV.A.2.)

Each citizen will choose his or her community service providers from available and qualified community service providers.

(Section V.A.2.)

Each citizen and his or her parent(s) or legal guardian(s) shall participate in the development of the Individual Support and Transition Plans ("ISTPs") as members of the IDT. As members of the interdisciplinary team, and as important participants, the input of citizens and parents or guardians shall be encouraged and respected by the other members of the team.

(Section V.A.3.)

Each citizen and his or her parent(s) or legal guardian(s) shall be informed of the recommendations of the independent evaluation and the IDT, including all feasible alternatives to the provision of services in a developmental center. Each citizen and his or her parent(s) or legal guardian(s) shall be informed of their freedom of choice regarding participation in the Medicaid home and community-based waiver. The State Defendants shall ensure that this freedom of choice is offered and honored as required by federal Medicaid regulations. The State Defendants shall ensure that the citizens are provided services that meet the citizens' individual needs as set out in the ISTP.

(Section V.A.4.)

State Defendants will provide each citizen appropriate developmental services in the most integrated setting consistent with his or her needs, and in a manner which promotes independence, enhances dignity and is as consistent as possible with the Guiding Principles of this Agreement.

(Section V.B.1.)

The Court finds it particularly compelling that the language of the Settlement Agreement concerning the freedom of

choice of the class member and his or her family members, guardians and/or conservators is consistent with Medicaid and ADA law on freedom of choice discussed above. As the Supreme Court recognized in *Olmstead*, 527 U.S. at 602, 119 S.Ct. 2176, there is no federal requirement under the ADA that community-based treatment must be imposed on citizens who do not desire it. There is also no express requirement in the Settlement Agreement imposing community-based treatment on citizens where they or their conservators have opted for institutional ICF/MR care. Because there are no such requirements in federal law or the Settlement Agreement, there is no merit to the contention of the United States and People First that the professional judgments of the IDT, IPE, and/or QRP as to appropriate community placement of a class member must always prevail over the citizen's own choice (expressed individually or through a guardian or conservator) of a qualified provider. Moreover, because there are no such requirements in federal law or the Settlement Agreement, there is no basis for the United States' argument that the parties have "already consented to the integration mandate and cannot, now, interpose an objection as a subterfuge to avoid compliance." (Docket Entry No. 972, United States' Response at 7.) As the PGA eloquently states,

> Conservators [and guardians]—who have the longest and most meaningful relationship with their loved ones and the greatest investment in their well-being—are in the best position, after considering the recommendations of professionals and any other relevant facts, to assess the risks and exposure of the less protective environment of community settings against any benefits community settings may provide for that particular individual and to make an informed decision as to whether to exercise the disabled person's right on his/her behalf to decline community placement."

(Docket Entry No. 973, PGA Response at 8 n. 28.) There is no evidence before the Court that the conservators' choices to transfer citizens to Mur–Ci Homes were motivated by anything other than their desire to assure the well-being of the CBDC residents for whom they are responsible. The Court concludes that the Settlement Agreement provides ample room for CBDC citizens, their conservators and guardians to decline community placement and to choose to receive services from a congregate care facility like Mur–Ci Homes, even if services could be provided in a more integrated setting. The citizen's choice to utilize the services of a particular Medicaid provider overrides any finding of the QRP that a major deficiency exists simply because the services offered by the provider do not constitute a community placement as that term is used in the Settlement Agreement.

While the Settlement Agreement embodies primacy of citizen choice, it also gives proper due to the judgments expressed by the professional members of the IDTs, IPEs, and the QRP who act within the roles assigned to them pursuant to the Settlement Agreement. Professional expertise is, as People First terms it, "the heart and soul of the promises made to class members by the State of Tennessee[,]" (Docket Entry No. 970, Preliminary Response at 5), and professional analysis of each class member's circumstances is valued by the citizens and their family members, guardians and conservators in order to determine the adequacy of placements for class members. (Docket Entry No. 973, PGA Response at 7.) Once a class member (or his or her conservator or guardian) chooses to receive services from a particular Medicaid provider and the QRP receives a transition plan crafted by

the IDT (at times with input from an IPE), the responsibility falls on the QRP to evaluate the placement before transition occurs to

> determine the adequacy of the placement and to ensure that the placement meets the individual needs of each citizen. Where the Panel determines that there are major deficiencies with a placement, the placement shall not occur until all the identified major deficiencies are corrected. Any other deficiencies shall be corrected in a timely manner.

(Settlement Agreement V.A.12.) Thus, the deficiencies in placements for particular individuals at Mur–Ci Homes identified by the QRP in its recent report at pages 7 and 8 (Docket Entry No. 969–1), are the types of deficiencies the Settlement Agreement envisions will be brought to the attention of all parties before placement occurs. This process of identifying and correcting deficiencies in particular placements, as spelled out in the Settlement Agreement, allows citizens and their conservators or guardians to benefit from professional opinion about whether a chosen Medicaid provider can realistically provide adequate services for the individual. If there are deficiencies noted by the QRP, the Settlement Agreement recognizes that corrections can be made so that the citizen's choice of that Medicaid provider is effectuated. If the noted deficiencies cannot be corrected, then the citizen, along with his or her conservator or guardian and IDT may utilize such information to assess the situation.

Whether the choice made by the 16 citizens who were recommended for community placement and their conservators to transition to Mur–Ci Homes was a "free choice" is a factual question that has not been developed by evidence and placed before the Court for consideration. The Court does not have before it the 9 transition plans that were given to the QRP for review to determine whether those plans properly document the nature of the citizen's "choice" of the Medicaid provider, nor does the Court have before it the ISPs and ISP amendments referenced by People First as documenting the needs and desires of class citizens regarding their placements. Even if this factual issue on "free choice" were more fully developed, the Court is not convinced that it would be prudent for the Court to consider it. The State conceded the closing of CBDC is not imminent and that citizens and their conservators who chose Mur–Ci Homes have a right to change their minds and request a different placement if they are doubtful that Mur–Ci Homes is the best choice for the individual. If any class member believes that his or her choice of Mur–Ci Homes as a placement was not a "free" choice, then, according to the State, that class member retains the right to exercise free choice to identify a suitable placement.

## III. *CONCLUSION*

For all of the reasons stated, the State's Emergency Motion To Compel Quality Review Panel To Comply With Settlement Agreement Or, In The Alternative, For Declaratory Relief (Docket Entry No. 965) will be granted in part and denied in part. The Court will deny the State's motion to compel the QRP to complete its review of the transition plans for the residents of Clover Bottom Developmental Center within twenty (20) days of receipt and for an Order precluding the QRP from finding a major deficiency in the proposed transition of CBDC residents to Mur–Ci Homes solely on the basis that Mur–Ci Homes is a large congregate care facility. The Court will grant the State's alternative motion for a declaration that neither the Settlement Agreement nor federal law precludes class members from choosing to receive

services from a congregate care facility even if services could be provided in a more integrated setting.

The Court will grant in part and deny in part the United States' cross motion. The Court will grant the United States' cross motion to the extent it seeks denial of the State's motion to overrule the QRP's determination that Mur–Ci Homes is not a community placement. The Court will deny the United States' cross motion to the extent it seeks an order directing the State, in accordance with the Settlement Agreement, to transfer promptly to the most integrated settings all residents who have been deemed appropriate to be served in the community, and an order forbidding the State to transfer to an institutional setting any class member who can be served in a more integrated setting.

The Court has fully explained in this opinion that the Settlement Agreement and federal law preserve a citizen's choice to transition from CBDC to an institutional setting, even if a more integrated community placement is appropriate and available, subject only to the QRP's evaluation of the transition plan for any major or other deficiencies apparent in the specific supports and care to be provided to the class member.

An appropriate Order will be entered.